UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| EDWARD "COACH" WEINHAUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Cause No. _____ |
| REGINA A. SCANNICCHIO, | ) | |
| And | ) | JURY TRIAL DEMANDED |
| the ILLINOIS JUDGES ASSOCIATION | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT
### (For Damages and Equity)

Now Comes, Edward "Coach" Weinhaus ("Plaintiff"), by and through counsel, seeking

redress for Defendant Regina A. Scannicchio and the Illinois Judges Association's violation of his

Constitutionally protected right to Due Process. In support of this claim, Plaintiff states as follows:

## INTRODUCTION

**"People of the same trade seldom meet together, even for merriment and diversion, but the
conversation ends in a conspiracy against the public, or in some contrivance…"**
Adam Smith, *An Inquiry into the Nature and Causes of the Wealth of Nations* (1776)

State Court Judges in a Business League? That is how one Illinois Circuit Court Judge and

three Illinois Appellate Judges contrived and coordinated to deprive Plaintiff of his Constitutionally

protected Right to Due Process by denying him the opportunity to seek redress through the State of

Illinois judicial process. The Business League, which dominates the state judiciary and acts as an arm

of the state has taken on interests of its own well outside of justice, as Adam Smith observed. Here,

the Plaintiff attempted to appeal the unlawful and unfounded decisions of Regina A. Scannicchio

wherein she repeatedly entered post-decree orders for fees and costs designed to quash his use of

Illinois unified court system only to be told by her Business League compatriots that that no appeal

would be permitted, upon information and belief, as a result of Judge Scannicchio's influence over fellow Business League members. The Business League members' domination of the state judiciary means that Plaintiff and others who cross the Business League can have no right to appeal a trial court decision, a right purportedly available to all, which Plaintiff was unfairly denied by the Business League.

The Business League's members and leaders took concerted actions to defend one of their own, Regina A. Scannicchio , denying fundamental rights after failing to intimidate or dissuade Plaintiff from pursuing his rights. It is no coincidence that this Business League picked up in Cook County, right where *Operation Greylord* left off, ultimately bringing in convicted felon ex-Alderman Ed Burke's wife to help cover their tracks[1]. Plaintff's ability to obtain justice in Illinois facing this Business League's leaders and members as its arbiters at the appellate level and above, while its members work in concert for each other's benefit has been chilled for long enough. This lawsuit follows.

## GENERAL ALLEGATIONS AS TO ALL PARTIES

### A. PARTIES

1.    Plaintiff is a citizen of Missouri, residing in St. Louis, and had been a litigant in Illinois.

2.    Defendant Hon. Regina A. Scannicchio ("TRIAL COURT JUDGE") is an Illinois state court judge, living and working in Cook County, Illinois. She is a citizen of Illinois[2].

3.    The Illinois Judges Association ("BUSINESS LEAGUE") is an Illinois-based Business League as defined pursuant to 26 CFR § 1.501(c)(6)-1, It is located in Chicago, Illinois. Upon information and belief, all of its members are citizens of Illinois and none are citizens of Missouri.

---

[1] Neal Edelstein's 17-part podcast *The Cooley Account* describes the longstanding Burke influence in Illinois corruption, including that of Burke's wife, retired Illinois Chief Justice of the Supreme Court, Anne Burke. See the first 20 minutes of Episode 9 and Episode 17.

[2] Non-party Hon. Michael B. Hyman ("PRESIDING APPELLATE JUSTICE") is an Illinois justice of the First District Court of Appeals, living and working in Cook County, Illinois. He is a citizen of Illinois. Non-Party Hon. Carl A. Walker and Defendant Hon. Mary Ellen Coghlan ("APPELLATE JUSTICE I" and "APPELLATE JUSTICE II" respectively) are Illinois justices of the First District Court of Appeals, living and working in Cook County, Illinois. They are citizens of Illinois. Together, the three panel Appellate Justices are referred to as "APPELLATE JUSTICES".

4.    The BUSINESS LEAGUE and its leadership actively promote – proudly - an agenda which flouts the United States Constitution, calling our founding protections as "grossly flawed." Describing it even after as "more suitable to an 18th century world."[3]

## B.  JURISDICTION, VENUE, AND JURY TRIAL

5.    This matter is being brought primarily pursuant to 42 U.S.C. §§ 1983.

6.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 as a federal question and over any supplemental state claims pursuant to 28 U.S.C. § 1367.

7.    This Court is an appropriate venue as the events herein occurred within the district and the Defendants reside within the district pursuant to 28 U.S.C. § 1391.

8.    Plaintiff requests a trial by jury.

9.    **Nothing in this action requests or demands the undoing of any state court action.** Instead, it seeks damages caused by *non-judicial* actions and prevention of future rights-depriving behavior by the Defendants. Most importantly, it seeks preventing members of the Illinois Judges Association from conspiring against the public and to transform it into a "Good" Business League of Judges – if that's possible.

## I.    STATEMENT OF FACTS

### PLAINTIFF

10.    Plaintiff is an attorney licensed and in good standing before the Courts of California, Missouri, and Illinois. He currently has multiple active cases before the courts of Illinois as an attorney, primarily serving Plaintiffs in cases against the arms of the State of Illinois for Freedom of Information

---

[3] These statements were published in a letter to the *News Gazette* by Defendant PRESIDING APPELLATE JUSTICE on behalf of the BUSINESS LEAGUE as its President and criticized in a subsequent letter by a former BUSINESS LEAGUE President, Justice Robert J. Steigmann. https://www.news-gazette.com/opinion/letters-editor/judge-misjudges-u-s-constitution/article_5661ec89-2c72-5eac-a836-93b90e08c8bc.html - last visited September 23, 2022.

Act violations. He had been a litigant before a Cook County Circuit Court, a court under the auspices of Illinois Court System for the times relevant herein.

11.     Plaintiff briefly resided in Illinois to move his children's mother to be closer to her family in 2012, the same year he dropped his Missouri Dissolution Action and instituted the Illinois Dissolution Action. In early 2013, he returned to Missouri from where he has served as a custodial parent for all relevant times.

12.     PLAINTIFF filed a case in the Eastern District of Missouri on January 31, 2022, as part of a defamation claim, demanding a third-party media investigation into the ethics of the TRIAL COURT JUDGE, before whom he then had no matters pending. (Case 4:22-cv-00115 E.D. Mo. "THIRD PARTY MEDIA INVESTIGATION CASE"). The Hon. Catherine D. Perry actively enforces the settlement agreement and its terms requiring the THIRD PARTY MEDIA INVESTIGATION, including in public rulings where each of the parties to the settlement have mentioned or referenced the TRIAL COURT JUDGE. E.g. ECF Docket #27 pg. 2.

### ILLINOIS JUDGES ASSOCIATION:
### A BUSINESS LEAGUE, NOT A LABOR ORGANIZATION STIFLES CRITICISM

13.     The ILLINOIS JUDGES ASSOCIATION (the "BUSINESS LEAGUE"), is a judge advocacy and lobbying group organized pursuant to Internal Revenue Code § 501(c)(6).

14.     The BUSINESS LEAGUE is a group of "people of the same trade" as Adam Smith would say (*supra*), albeit *judges*. They are judges bound to each other in their efforts at mutual gain and jointly exercising their pursuit of it. Their association does not end when their members don their robes.

15.     The BUSINESS LEAGUE promotes its "Membership Benefits" on its website (IJA.org). It represents the interests of underlined judges - *not litigants*. It offers individualized assistance to its judge-members for dealing with *public matters*. It takes particular attention to assist its member-judges

4

for "public criticism." It represents its members to the media, advocates for its members for renumeration and benefits, and *individually assists in ethics matters*.

16.     The BUSINESS LEAGUE does not qualify as a Labor Organization in Illinois under statute. It is not a union, it is a *trade* association.

17.     This is in fact is the promise the BUSINESS LEAGUE offers its members through its promise of coordinated reputational promotion.

18.     The BUSINESS LEAGUE has ensured Illinois state court judges are the highest paid in the land, only behind California. In fact, a first year Illinois judge vastly out-earns a federal magistrate.

19.     Thus, the BUSINESS LEAGUE, which advocates for judges' compensation and protects judicial reputations, has been wildly successful at both. Indeed, that is its purpose.

20.     Recently, the IJA empaneled former justices of Illinois appellate courts, including Hon. Anne Burke (Ret.), former Chief Justice of the Illinois Supreme Court and wife of convicted felon, ex-Alderman Ed Burke to defend IJA judges when the IJA judges might have been prevented by the rules of ethics from doing so themselves. See Exhibit 1.

## IJA: A BUSINESS LEAGUE AS AN ARM OF THE STATE

21.     It is axiomatic that appellate justices oversee trial court judges. If not for the Appellate Court's inherent authority to enforce its issuance of remands and reversals, its opinions would be merely supervisory. Appellate courts thus hold trial courts in contempt as a matter of course, if only rarely. Most people forget this inherent truth because the idea that judges wouldn't be arbiters of justice, thus requiring contempt findings is almost unthinkable.

22.     Further, lawyers are often prohibited from suggesting critique of courts that reflect poorly on the judiciary by ethical rules. E.g. IRPC 8.4(d). In short, we don't often invoke the inherent

5

disciplinary power of our appellate houses of "truth" but they are nonetheless the backbone of our system.

23.     Membership has its privileges. But, it wasn't always this way.

24.     Supervising justices in Illinois once refused to join the BUSINESS LEAGUE, because they are "management." "Management should not join the union[sic]."[4]

25.     For its early existence (founded in 1972 ), supreme court justices were not permitted to join the BUSINESS LEAGUE nor did they want to. They knew better than to mix with and tie their future compensation to those they oversaw. That uneasy dividing line was breached conscientiously by Appellate Court Justice Tom Moran, who, already flouting ethical duties by overseeing trial court fellow-members, insisted he retain his membership in the BUSINESS LEAGUE when becoming an Illinois Supreme Court justice.

26.     Now, Supreme Court justices and appellate court justices join the BUSINESS LEAGUE without a second thought, retain their leadership positions, and market them in their judicial bios. Further, they assume duties to the BUSINESS LEAGUE by becoming board directors, officers, committee chairs, and benefit from promoting it, and protecting their fellow BUSINESS LEAGUE members.

27.     This change in membership, association, duties, and leadership in the BUSINESS LEAGUE (not a union) has established that Litigants' interests firmly rank behind those of the judges' own pecuniary interests through their joint reputational protection in a BUSINESS LEAGUE outweighing any individual litigant's right to a fair hearing.

28.     The BUSINESS LEAGUE's core promise to its Members is to defend their reputations and professional standing, for the pursuit of their joint financial benefit.

---

[4] "*Passing the Gavel: A History of the Illinois Judges Association 1971-1996*" Hon. S. Wachowski and Hon. P. Benefiel. https://www.ija.org/assets/IJA%20History%20Book%201%202.pdf

29.     They even seek to defend each other against just criticism, according to the panel of judicial luminaries they have empaneled to defend themselves. See Exhibit 1. The Burke-led Emeritus Council of the BUSINESS LEAGUE's purpose is to defend judges "deeply invested" in cases, falling victim to "just criticism." They write (Exh. 1):

> **"There may be times when judges are entitled to be justly criticized by the media. There are also times when they are not."**

30.     But it is their domination of an arm of the state and the state's obeisance to the BUSINESS LEAGUE that is so nefarious.

31.     The Illinois Supreme Court's bios (as of late 2023) summarize the incredible power the BUSINESS LEAGUE has amassed by merely encroaching into the halls of Illinois' Supreme Court since Justice Moran made his stand in the mid-1970's.

32.     Taken from the Illinois Supreme Court's web bios, Chief Justice Mary 50 is the past President of the BUSINESS LEAGUE. Justice Scott Neville, Jr. is an active member. Justice David Overstreet is the current President and a past Director. Justice Holder White is a member and a past Director. Justice Elizabeth Rochford is the current Secretary.

33.     Other justices list nothing on their bio, but are featured speakers at BUSINESS LEAGUE events (such as Justice Mary K. O'Brien) or covered in the BUSINESS LEAGUE's trade publication (such as Justice Joy V. Cunningham).

34.     The BUSINESS LEAGUE's capture of the Illinois Judiciary's workings is so complete, that 50% of the committee the Illinois Supreme Court relies on for ethics must be appointed by the BUSINESS LEAGUE (the Illinois Judicial Ethics Committee).

35.     That is, the BUSINESS LEAGUE, whose members work together to control the Illinois Supreme Court, is empowered by the State of Illinois to write the rules of ethics for all of the

judges for the entire state of Illinois. These rules are then adopted by the BUSINESS LEAGUE-dominated Illinois Supreme Court.

36.     The state's reliance on the BUSINESS LEAGUE is so complete, that it proudly touts it on the website. Illinois pays the judges dues to create their BUSINESS LEAGUE, then empowers them to write all the rules, join together to rule over the people, protect each other without disclosure, enforce the rules to the detriment of any other group, then both the state and the BUSINESS LEAGUE *brag* about it[5]. The BUSINESS LEAGUE is as such a state actor.

37.     Therein lies the complete domination to which PLAINTIFF is subjected – when the BUSINESS LEAGUE itself is challenged, the BUSINESS LEAGUE, as an arm of the state, protects itself, and the individual's right to due process in front of a fair and impartial judiciary is gone.

38.     If the BUSINESS LEAGUE is challenged by an attorney, the attorney could be challenged with a disciplinary action. Lo and behold, that happened here too[6]. And guess who ultimately rules who can serve as an attorney in Illinois – the BUSINESS LEAGUE-dominated Illinois Supreme Court.

**PLAINTIFF 'CROSSES' BUSINESS LEAGUE TRIAL COURT JUDGE**

39.     Plaintiff filed a timely notice of appeal of TRIAL COURT JUDGE's order sanctioning him on October 8, 2020, when no other matters were pending before her. It was a simple issue[7], a final order, and properly preserved for appeal.

40.     While the appeal was pending, other matters arose before the TRIAL COURT JUDGE (bringing Plaintiff back before her) including the matter of the TRIAL COURT JUDGE's ethical lapses, which thus questioned all of the TRIAL COURT JUDGE's subsequent opinions.

---

[5] Eg. https://www.illinoiscourtscommission.gov/rules/code-of-judicial-conduct/ ; https://www.ija.org/about-the-illinois-judicial-ethics-committee-for-the-public-   (last visited March 31, 2024).
[6] This Court has available to it evidence of TRIAL COURT JUDGE's ethics complaint against PLAINTIFF with the ARDC, still pending at the time of filing. N.D. Ill. Case # 1:24-cv-01757 ECF #4.
[7] It did not relate to any children's issues and never claimed to do so.

Plaintiff filed timely notices of appeal, and consolidated the appeals[8] successfully when necessary, in the First District.

41.     Plaintiff's action was fully briefed before the First District Court of Appeals, again, when no other matters were before the TRIAL COURT JUDGE.

42.     APPELLATE JUSTICES were faced with Plaintiff's brief that directly recounted the ethical lapses of their fellow BUSINESS LEAGUE Director.

43.     After PLAINTIFF'S appellate brief was accepted, the APPELLATE JUSTICES learned of the THIRD PARTY MEDIA INVESTIGATION CASE, which was filed on January 31, 2022 in the Eastern District of Missouri federal court, whose introduction read:

> A rogue judge in Illinois (the [TRIAL COURT JUDGE]) forbade Illinois-resident children from being inside the State of Illinois in one of the many abuses of the family law system around the country. A father had the temerity to fight back on behalf of his children…
> Complaint, at ¶ [INTRODUCTION].

44.     The THIRD PARTY MEDIA INVESTIGATION CASE Complaint details many of the same issues noted above but is particularly graphic about the unrelated-to-Plaintiff allegations:

> While waiting for his own case to be called, [Plaintiff] witnessed [TRIAL COURT JUDGE] trample on the basic civil rights of an African American, unwed mother seeking to find the father of her two-year old child. [TRIAL COURT JUDGE] sentenced the two-year old's only known parent to seven days in prison after ordering an illegal search and seizure in the courtroom. [TRIAL COURT JUDGE] admitted the elements of the illegality of the search which was captured in a court transcript.
>
> Id. at ¶ 58.

45.     PLAINTIFF had demanded as part of the Complaint that a podcast episode into the TRIAL COURT JUDGE's ethics be published:

> DEFENDANTS shall create a second new episode ("[TRIAL COURT JUDGE] EPISODE") of their podcast distributed as would any other episode specifically covering the actions of TRIAL COURT JUDGE to be titled, "Abusive Discretion"

---

[8] These new matters did pertain to children's issues and thus the consolidated appeal did as well invoking Ill. Sup. Ct. Rule 311(a).

> to cover TRIAL COURT JUDGE's career of (wittingly or unwittingly) abusing her position to harm parents. DEFENDANTS will pay [PLAINTIFF] to assist in producing the [TRIAL COURT JUDGE] EPISODE and will grant PLAINTIFF final authority on editorial decisions related to the [TRIAL COURT JUDGE] EPISODE.
>
> Id. at ¶ 89(d).

46.     Following settlement, a federal district court is enforcing a third-party media investigation into TRIAL COURT JUDGE's ethical violations as a result of Plaintiff's actions[9] which has already yielded results. ECF #27 (Exhibit 4).

### TRIAL COURT JUDGE ACTS TO PROTECT HERSELF FROM CRITICISM

47.     Upon information and belief, TRIAL COURT JUDGE became aware of the THIRD PARTY MEDIA INVESTIGATION CASE from an attorney who practices before her.

48.     Since then, TRIAL COURT JUDGE worked with the attorney to file an ethics complaint against PLAINTIFF for his judicial reform work at ChildrenOfTheCourt.org (PLAINTIFF is also the founding funder of the Legal Accountability Project improving clerkships and served as the Special Media Advisor to the Chairman of the Knesset's Constitution, Law, and Justice Committee during Israel's debates over judicial reform in 2023).

49.     TRIAL COURT JUDGE acted to defend her reputation when PLAINTIFF's reform activities challenged her political position in an election year. See fn. **_**.  Additionally, TRIAL COURT JUDGE admitted to reaching out to another judge to protect her reputation even though no pending case was before her.

---

[9] This issue was raised in the Enforcement action in the THIRD PARTY MEDIA INVESTIGATION CASE by the Defendants (ECF #27). Plaintiff's Reply Brief mentions the increased reporting legal news around the ethics of the TRIAL COURT JUDGE and her connections to convicted felon ex-Alderman Ed Burke, and his continuing influence on Illinois State Court judges. ECF #31. The demanded Second Episode from the original Complaint has not occurred and any discussion of it would be subject to Confidentiality. Other legal media has begun uncovering the issue. See "Burke's lasting legacy: "Cook County's courts harbor favored, connected judges", *Cook County Record*, Feb. 8, 2024, https://cookcountyrecord.com/stories/654365619-burke-s-lasting-legacy-cook-county-s-courts-harbor-favored-connected-judges ; *also see* "Election 2024: Ald. Burke headed behind bars, but Burke's judges still rule the Cook County bench ", *Chicago City Wire*, Feb. 2, 2024 https://chicagocitywire.com/stories/654032788-election-2024-ald-burke-headed-behind-bars-but-burke-s-judges-still-rule-the-cook-county-bench . (After the Parties' discussion of TRIAL COURT JUDGE and the defendants' production of their Exhibit 4 to comply with the agreement, that particular enforcement request was denied, while the Federal District Court retains jurisdiction over the remaining enforcement obligations including Confidentiality. ECF #32.)

50.     Upon information and belief, TRIAL COURT JUDGE communicated with APPELLATE JUSTICES and the BUSINESS LEAGUE as it relates to Plaintiff's actions criticizing her in efforts to defend her reputation and succeeded in receiving their support.

### THE BUSINESS LEAGUE ACTS TO PROTECT ITS OWN

51.     The BUSINESS LEAGUE's promise of benefits to the members and directors for taking coordinated actions to protect members from ethical complaints is the crux of the BUSINESS LEAGUE's value ("BUSINESS LEAGUE Scheme").

52.     Upon information and belief, the BUSINESS LEAGUE actively tracks any public information about its members, especially its leadership including actual and potential media coverage as well as court complaints, for the purpose of delivering the promised member benefits.

53.     The BUSINESS LEAGUE markets that judges who receive pecuniary benefit from a proceeding before them ought to recuse themselves. The BUSINESS LEAGUE markets pecuniary benefit from itself for members. The BUSINESS LEAGUE does not require BUSINESS LEAGUE judges to disclose the pecuniary benefit received from the BUSINESS LEAGUE, its directors, and its fellow members when adjudicating cases that clearly implicate this pecuniary benefit.

54.     The BUSINESS LEAGUE Scheme compensates its own members for ensuring that they defend each other in ethical matters, encourages its members to band together to protect and defend each other doing so, earns memberships through offering this benefit, and thus incentivizes the removal of rights such as those of Plaintiff.

55.     BUSINESS LEAGUE Members (and all Defendants) benefited from the Scheme against Plaintiff and benefit from the scheme against all those dissuaded from or denied the right to an appeal.

56.     APPELLATE JUSTICES are all either active members and directors of the BUSINESS LEAGUE and market their involvement in the same, or have held such leadership roles

as to be inextricably-linked to the BUSINESS LEAGUE's success. (See State Court Bios of Justices

Hyman and Walker, and Justice Coghlan's history as BUSINESS LEAGUE Convention Chair.)

57.     They served together as APPELLATE JUSTICES on the same district court panel in

question for the named Plaintiff.

58.     The harm to one BUSINESS LEAGUE Director visits harms upon other members,

officers, and directors who promote their affiliation with and leadership of the BUSINESS LEAGUE

59.     The Illinois Code of Judicial Canon, requires that the APPELLATE JUSTICES

disclose their pecuniary relationship with the TRIAL COURT JUDGE and the BUSINESS

LEAGUE.

60.     Further, the then-existing canons required:

    a. "CANON 2: A Judge Should Avoid Impropriety and the Appearance of
       Impropriety in All of the Judge's Activities"
    b. CANON 3: A Judge Should Perform the Duties of Judicial Office Impartially
       and Diligently.

61.     Rather than follow the Judicial Canons and disclosing their interests in protecting the

TRIAL COURT JUDGE's reputation, they proceeded to protect her.

62.     The First District Court of Appeals appointed a panel made entirely of BUSINESS

LEAGUE Marketed Justices - the APPELLATE JUSTICES.

63.     When Plaintiff's timely appeal was before the APPELLATE JUSTICES calling into

the ethics of TRIAL COURT JUDGE, they ignored Plaintiff's due process rights in favor of their

duty to the BUSINESS LEAGUE and their fellow member.

64.     The reason the APPELLATE JUSTICES reacted as they did is because the nature of

the appeal that landed before them – it was not only coupled with *public exposure* from the just-filed

THIRD PARTY MEDIA INVESTIGATION CASE, but it also called into question the very ethics

of the TRIAL COURT JUDGE who was then a Co-Director of the BUSINESS LEAGUE. Rather

than adjudicate the merits of the appeal which would have undoubtedly exposed the ethical violations

of a BUSINESS LEAGUE Director, APPELLATE JUSTICES *circled the wagons* and defended their own.

65. There were timely notices of appeal before the APPELLATE JUSTICES. There was a timely filed brief before them appealing final orders of the TRIAL COURT JUDGE. There were no matters before the TRIAL COURT JUDGE. There was an (unopposed) extension of time for the Appellee to respond who had not submitted a brief.

66. Plaintiff had won significant redress throughout the entire post-decree divorce process including full-time residential custody of two of his children. He had overpaid child support pursuant to a Supplemental Judgment. He worked multiple jobs, earned multiple degrees, and became licensed in multiple states. By all objective measures, he was following the pronouncement of this Court to appeal significant wrongs visited by TRIAL COURT JUDGE in the state forum.

67. Plaintiff had never had an appeal brief before the state court where he was required to appeal. No other matters were pending. There was no basis in Illinois law for denying jurisdiction to hear a mandatory appeal under Illinois Supreme Court Rule 301.

68. Rather than disclose their relationship to the TRIAL COURT JUDGE or recuse themselves, the APPELLATE JUSTICES decided to violate Plaintiff's Due Process rights and dismiss the appeal without any consideration of the court's jurisdiction or the merits of the appeal to benefit themselves and their fellow BUSINESS LEAGUE members.

69. Plaintiff's Due Process rights were violated when he we denied his right to have his appeal heard by an impartial tribunal – a tribunal which had not been composed of BUSINESS LEAGUE members whose financial interests would be directly impacted by a decision adverse to another BUSINESS LEAGUE member.

70. There was no motion before the APPELLATE JUSTICES calling for its dismissal. Instead, they refused to hear the appeal on their own motion.

71.     Opposing counsel in that matter spoke with Plaintiff the following day and admitted, "They can't do that."

72.     They dismissed the appeal without any legal basis for dismissal and without any consideration two weeks after the filing of Plaintiff's Complaint in the THIRD PARTY MEDIA INVESTIGATION CASE.

73.     While there was no basis for the dismissal under the law, in an effort to protect their colleagues' reputation and, by extension, the reputation of the BUSINESS LEAGUE.

74.     That is, Plaintiff's right to appeal was denied him because of *whose* orders he was appealing. APPELLATE COURT JUSTICES chose not to review the appeal, but instead rely on the BUSINESS LEAGUE and its weight, by citing TRIAL COURT JUDGE, as to why it was denying the appeal. Plaintiff lost his right to appeal because the TRIAL COURT JUDGE said he was *bad*, the very judgment he was appealing.

75.     APPELLATE JUSTICES were even more clear. This was a purportedly-sanctioned litigant by one of their own – by their BUSINESS LEAGUE Co-Director. PLAINTIFF had a right to appeal *that sanction* and attempted to exercise his due process rights. But the APPELLATE JUSTICES determined that he did not deserve to appeal the TRIAL COURT JUDGE's sanction.

76.     Thus, APPELLATE JUSTICES did not afford Plaintiff his Due Process right to an Appeal based on the very order he was appealing as they were being compensated by the BUSINESS LEAGUE Scheme to do so.

77.     In their haste to defend their BUSINESS LEAGUE Co-Director, they failed to examine:

        a.  The brief;
        b.  The record;
        c.  The law;
        d.  The case disposition;
        e.  And certainly not Plaintiff's rights.

78.     Because the Appellate Justices were so eager to deny the Plaintiff's due process rights, they failed to note that Plaintiff had a timely filed appeal of final orders before it, an absolute right pursuant to Illinois Supreme Court Rule 301.

79.     An individual's right to an appeal is not subject to the identity of the judge whose order is being appealed nor the severity of the accusations against her.

80.     Plaintiff's appellate rights cannot be subject to the whims and findings of the Judge being appealed, such structure offends the ideal of appellate review.

81.     In this situation, APPELLATE JUSTICES saw the identity of the lower court judge and, to ensure the integrity of the BUSINESS LEAGUE, adopted her position *lock, stock, and talking point*. "He must be stopped. She must be protected. The BUSINESS LEAGIEs interests are at stake," they reasoned, and then acted accordingly.

82.     By adopting the TRIAL COURT JUDGE's position, APPELLATE JUSTICES, furthered her acts of intimidation and deterrence in their attempts to dissuade Plaintiff for seeking redress through the courts and thereby protecting Trial Court Judge's reputation.

83.     PLAINTIFF hired now-Third District Clerk Benjamin Lawson to address the APPELLATE JUSTICES' decision at significant expense. Mr. Lawson filed a Petition for Leave to Appeal to the BUSINESS-LEAGUE-dominated Illinois Supreme Court.

84.     The BUSINESS LEAGUE-dominated Illinois Supreme Court denied PLAINTIFF's timely filed Petition for Leave to appeal on April 18, 2022.

85.     . The BUSINESS LEAGUE's influence was so strong, they convinced APPELLATE JUSTICES to issue a minor sanction prior to Mr. Lawson filing a response to a fee petition. Mr. Lawson's Response to the sanction fee Petition, *previously ordered to be prior to any award*, was only allowed *after* the APPELLATE JUSTICES issued an award not bothering to hear Mr. Lawson's Response! His

subsequent Response for which Mr. Lawson was granted leave, remains pending before the appellate court, which they refuse to consider now, two years and counting.

86.     The BUSINESS LEAGUE serves as the conduit through which pecuniary benefit accrued to the TRIAL COURT JUDGE and its members tendered by the APPELLATE JUSTICES. The BUSINESS LEAGUE, through its Scheme, compensated the APPELLATE JUSTICES, the TRIAL COURT JUDGE to deny Plaintiff his due process right to an appeal.

87.     Plaintiff no doubt believes he would have won a fair hearing. Plaintiff also spent significant sums of money to attempt to undo the damage the DEFENDANTS caused and is experiencing significant ongoing harm due to the continued domination of the Illinois judiciary by the BUSINESS LEAGUE.

## COUNT I 42 U.S.C. § 1983

### The Hon. Regina A. Scannicchio and the Illinois Judges Association

Comes now Plaintiff and for Count I of his claim for relief against the defendants herein, allege and state as follows:

88.     Plaintiff restates and re-alleges all prior paragraphs.

89.     Defendants at all times relevant hereto were acting under color of state law.

90.     Plaintiff was due the Equal Protection of the law and Due Process before an impartial judge and appellate tribunal.

91.     Through Defendants' actions, they illegally interfered with Plaintiff's Constitutionally protected right to due process and prohibited him from seeking redress through the Illinois State Court system.

92.     Defendants' actions interfered with Plaintiff's due process rights without any basis in law.

93. These actions were taken under the color of state law in that they resulted in judicial determinations that denied appellate rights when a BUSINESS LEAGUE Member's ethics were questioned and overseen by a majority-BUSINESS LEAGUE dominated review panel.

94. Plaintiff has suffered significant financial injury via actually incurred attorney's fees and costs in pursuit of the underlying state court matter and this lawsuit.

**WHEREFORE**, the Plaintiff, EDWARD "COACH" WEINHAUS, respectfully requests this Court grant the following relief:

A. Enter judgment against the Defendants for a violation of 42 U.S.C § 1983;

B. Enter judgment against the Defendants, jointly and severally, in an amount of $1 to Plaintiff for nominal damages;

C. Enter judgment against the Defendants, jointly and severally for compensatory damages;

D. Enter judgment against the Defendants, jointly and severally, in an exemplary amount for punitive damages;

E. Enter judgement against the Defendants for attorneys' fees and costs as allowable by law;

F. Enter judgment against the Defendants for other such and all possible further relief as is deemed equitable and just in law and in equity, however not to reverse the decisions of any state court.

## DEMAND FOR JURY TRIAL

Pursuant to the United States Constitution, the Fed. Rules of Civ. P. 38, and other applicable rules and statutes, Plaintiff EDWARD "COACH" WEINHAUS hereby demands a trial by jury on all issues herein triable of right by a jury.

April 17, 2024

*S/ Antonio Valiente*

**Antonio Valiente**
USDC-PR No. 213906

PHV Application Pending

Torre de La Reina – Suite 203
450 Avenida de La Constitucion
San Juan, PR 00901
Tel:   787-782-9544
LCDOAVALIENTE@LIVE.COM